UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **SHELLY O. DEVILLO,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **5:15-cv-02211-AKK** |
| **VISION CENTRIC, INC.,** ) | |
| ) | |
| **Defendant.** ) | |

## **MEMORANDUM OPINION**

Shelly O. DeVillo filed this action alleging that her former employer, Vision Centric, Inc., violated the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 2409 ("WPA"), by discharging her in retaliation for reporting potential violations of the Federal Acquisitions Regulations ("FAR"). *See generally* doc. 1. Presently before the court is Vision Centric's motion for summary judgment, doc. 22, which is fully briefed, docs. 22; 27; 30, and ripe for review. For the reasons stated below, the motion is due to be granted.

### **I.     STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine dispute of material fact. *Id.* at 323. The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal citations and quotation marks omitted). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 244 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual dispute will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *But see Pace v. Capobianco*, 238 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary

judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. FACTUAL BACKGROUND[1]

DeVillo worked as a project coordinator for Vision Centric, a defense contractor. During the relevant period, Vision Centric worked on a project known as the "Fuel Depot Contract" with the United States Army Corps of Engineers. *See* doc. 23-1 at 5. DeVillo reported directly to Cynthia Cotton, Vision Centric's Task Order Lead at the "DLA [Defense Logistic Agency] Fuel Group." *Id.* at 6.

At some point after DeVillo started her employment, Bridget Knatt, an administrative assistant with the Army Corps of Engineers, began working with the DLA Fuel Group as the government's onsite representative. *See id.* at 11. Knatt engaged in "hands on" supervision of DeVillo's team. *See* doc. 23-1 at 7

---

[1] The court has reviewed DeVillo's affidavit, doc. 27-1, and notes that, despite DeVillo's attestation that she told Curry during the April 2, 2015 meeting that "Ms. Knatt could not direct Vision Centric employees because it was a violation of the FAR," *id.* at 3, for the reasons explained in Part III.A., *infra*, she still cannot prove that any alleged retaliatory motive was the but-for cause of her separation. Additionally, even though DeVillo disputes her underlying conduct that formed the basis for Curry's opinion that DeVillo had behaved aggressively with Vision Centric's customer, *see id.* at 4, for the reasons stated in Part III.B, *infra*, these disputes do not change the ultimate outcome. Accordingly, the motion to strike DeVillo's affidavit, doc. 31, is **MOOT**.

3

("Bridget's position was as a direct supervisor for our group."). DeVillo and Knatt undisputedly engaged in some degree of verbal conflict[2] and disagreed about how best to complete various assignments. On a few occasions, DeVillo complained to Cotton about Knatt "being given the authority to supervise" DeVillo's team, along with complaints about Knatt's personality and supervisory methods. *See, e.g.*, *id.* at 13, 16. After Cotton failed to forward DeVillo's concerns to Virgil Curry, Vision Centric's President, *see* doc. 23-1 at 13, DeVillo emailed Curry directly to request a meeting. *See* docs. 23-4 at 2 ("Mr. Curry, Will you have some free time to meet with me next week. I have some concerns in regards to Vision Centric being successful on this project at the Corps, that I feel you should be aware of. . . . ."); 23-2 at 23.

Before DeVillo could meet with Curry, DeVillo and Knatt engaged in further disagreements. The final one involved a shouting match that led to Cotton asking DeVillo to meet with her. *See* doc. 23-1 at 22–23. After DeVillo told Cotton, "We cannot work like this . . . I feel I have no other option but to file a complaint," Cotton immediately asked for DeVillo's badges, directed DeVillo to clean out her desk, and instructed DeVillo to meet her at Curry's office. *See* doc. 23-1 at 23–24. During the meeting, DeVillo told Curry that she believed Knatt's

---

[2] DeVillo testified that Knatt engaged in conduct such as "[y]elling, slamming the doors, [and] . . . physically blocking [DeVillo] from leaving the office." Doc. 23-1 at 22.

supervision of her team violated the FAR and the subcontract.[3] Curry purportedly responded, "Well, it's obvious that you can't go back to work there," and gave DeVillo three options: "resign, be put on administrative leave without pay, or we can terminate you and put it somehow so you can get your unemployment." *See* doc. 23-1 at 53. *See also* doc. 23-2 at 13–14 (Curry's testimony that "[E]ven though . . . we gave [DeVillo] the options, . . . we really didn't want to lose [DeVillo]. And that's the reason why we opted — or I opted to give her a, you know, 'You can't go back there, but if I can find another spot for you, then I would, as soon as I can. But I don't have one now.'"). The following day, when DeVillo informed Curry that she would not resign, Curry discharged DeVillo.

### III. ANALYSIS

The WPA prohibits retaliation against employees of defense contractors who report certain types of misconduct. *See* 10 U.S.C. § 2409(a)(1). As Vision Centric

---

[3] DeVillo states that she told Curry during the meeting, "[Knatt] is a government employee . . . according — per the FAR regulation and spelled out on the contract, no government employee is being in direct supervision over blah, blah, blah." Doc. 23-1 at 26. FAR § 37.104 provides, in relevant part, that "agencies shall not award personal service contracts unless specifically authorized by statute." 48 C.F.R. § 37.104(b). *See also id.* § 37.104(a) ("The Government is normally required to obtain its employees by direct hire under competitive appointment or other procedures required by the civil service laws. Obtaining personal services by contract, rather than by direct hire, circumvents those laws unless Congress has specifically authorized acquisition of the services by contract."); *id.* § 37.104(c)(2) ("[T]he key question always [is]: Will the Government exercise relatively continuous supervision and control over the contractor personnel performing the contract? . . . [R]elatively continuous Government supervision of a substantial number of contractor employees would have to be taken strongly into account."). The subcontract between Vision Centric and the Army Corps of Engineers also states that "[t]he [Vision Centric] employee will perform independent of and without the supervision of any government official." *See* docs. 23-1 at 34; 23-2 at 21.

correctly notes, "there is little judicial gloss regarding the proper framework to adjudicate claims under the WPA." Doc. 22 at 18. Indeed, it appears the Eleventh Circuit has not addressed the issue.[4] Because both parties direct the court to cases out of the Eastern District of Virginia that have applied the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to WPA retaliation claims, *see* docs. 22 at 18 & 27 at 25 (citing *United States ex rel. Cody v. ManTech Int'l Corp.*, 207 F. Supp. 3d 610 (E.D. Va. 2016); *Dillon v. SAIC, Inc.*, No. 1:12-cv-390, 2013 U.S. Dist. LEXIS 11200 (E.D. Va. Jan. 28, 2013)), the undersigned will join that court in importing the *McDonnell Douglas* framework for purposes of analyzing DeVillo's claim. Under this framework, DeVillo "must first establish a prima facie case by demonstrating (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment decision, and (3) the decision was causally related to the protected activity." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1243 (11th Cir. 2010). If DeVillo can establish a *prima facie* case, then Vision Centric must articulate a legitimate, nonretaliatory reason for DeVillo's discharge. Finally, if Vision Centric meets this burden, then DeVillo must show pretext to survive summary judgment.

---

[4] This court found only one case in which a court in this Circuit discusses the WPA. *See Quinn v. Booz Allen Hamilton, Inc.*, No. 3:14-cv-111-MCR-EMT, 2014 U.S. Dist. LEXIS 190045, at *5 (N.D. Fla. Dec. 2, 2014). The court's opinion, however, does not identify the relevant analytical framework for a WPA retaliation claim.

**A. DeVillo Cannot Establish a *Prima Facie* Case.**

Vision Centric contends that DeVillo cannot establish a *prima facie* case because Virgil Curry did not know that DeVillo had complained of possible violations of the FAR prior to his decision to separate her from employment with Vision Centric. *See* doc. 22 at 18–19.[5] DeVillo does not dispute that Curry had no prior knowledge and indeed admits that Curry stated, during the meeting, that it was the "first time" he was "hearing about" any of DeVillo's complaints. *See* doc. 23-1 at 52.[6] *See also id.* at 24 ("When we went in there, I got the impression from Mr. Curry that he knew nothing about this, that Cynthia Cotton had not mentioned any of these issues . . . ."). DeVillo maintains, however, that she complained to Curry about the suspected FAR violations minutes before Curry stated that DeVillo could no longer work on the Fuel Depot Contract and presented her with the three separation options. *See id.* at 52. To the extent DeVillo maintains that the complaint about the FAR in the meeting is sufficient, this sequence of events does not aid DeVillo in establishing a *prima facie* case, because "[anti-]retaliation provisions do not allow employees who are already on thin ice to insulate

---

[5] As Vision Centric points out, DeVillo's written complaints to the Inspector General's office "make no mention of" any report that DeVillo complained to Curry about potential FAR violations and, "after the Inspector General's office found that there was no cause for an investigation, [DeVillo] testified to making such a disclosure during [her termination meeting]." Doc. 22 at 18–19.

[6] Although DeVillo emailed Curry on March 20, 2015 to request a meeting, she stated only that she "ha[d] some concerns in regards to Vision Centric being successful on this project at the Corps." Doc. 23-4 at 2.

themselves against termination or discipline by preemptively [engaging in protected expression]." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1270 (11th Cir. 2010). The uncontroverted evidence is that Curry believed, based on what he heard from Cotton and DeVillo, that DeVillo had been "confrontational," "disrespectful," "aggressive," and "unprofessional" with Knatt, Vision Centric's customer's onsite representative. *See* doc. 23-2 at 13, 17. As Curry put it, "[t]hat's not the way we do business." *Id.* at 13. *See also Alvarez*, 610 F.3d at 1270 ("The record . . . establish[es] that [the employer] had legitimate, non-[retaliatory] reasons to fire [the plaintiff] before she complained, and it remained free to act on those reasons afterward."). Therefore, where, as here, "something in [DeVillo's] complaint or the manner in which she made it [gave] [the decision maker] an objectively reasonable basis to fear that unless [DeVillo] was fired she would sabotage its operations . . . .," *see Alvarez*, 610 F.3d at 1270, DeVillo cannot establish the necessary causal link to establish a *prima facie* case.

Perhaps because DeVillo recognizes that she cannot establish a *prima facie* case if Curry is the decision maker, DeVillo contends instead that Curry was a mere "cat's paw" for Cotton's decision, acting under "apparent authority," to discharge DeVillo. *See* doc. 27 at 27.[7] In further support of this contention,

---

[7] *See Crawford v. Carroll*, 529 F.3d 961, 979 n.21 (11th Cir. 2008) ("Under a 'cat's paw' theory, a non-decisionmaking employee's [retaliatory] animus may be imputed to a neutral

8

DeVillo maintains that Cotton knew about DeVillo's protected activity and essentially discharged DeVillo when Cotton asked for DeVillo's badges and directed DeVillo to clear out her desk before the meeting with Curry. *See id.* at 27–28. There are several flaws with this contention. First, DeVillo acknowledges that Curry presented her options that included continued employment with Vision Centric, albeit initially in an unpaid capacity until he could send her to another assignment, which belies DeVillo's contention that Curry simply carried out a discharge decision Cotton had purportedly already made before the meeting with Curry. Second, Curry presented DeVillo the various options after he gathered facts in the meeting about the incident with Knatt, which undermines also DeVillo's contention that Curry simply carried out Cotton's decision. Finally, even if DeVillo is correct that Cotton made the decision to discharge her, there is insufficient evidence in this record to show that DeVillo specifically complained to Cotton about the suspected FAR violations prior to Cotton asking for DeVillo's badges.[8]

---

decisionmaker when the decisionmaker has not independently investigated allegations of misconduct.").

[8] DeVillo testified generally that she complained to Cotton about Knatt "being given the authority to supervis[e]." Doc. 23-1 at 16. DeVillo also testified that she "took [the] immediate opportunity to discuss [with Cotton] what had just happened," following an incident where Knatt placed her arm in a door threshold in an attempt to prevent DeVillo from leaving the office for lunch. *Id.* at 13. DeVillo further testified that she emailed Curry to request a meeting "after the prior discussions with Cynthia [Cotton] and complaints to Cynthia had gone nowhere," but does not specify the substance of those discussions and complaints. *See id.* at 52. Finally, after

To establish a *prima facie* case of retaliation, an employee must show that "what he said . . . put [the employer] on notice that he was protesting an illegal employment practice." *EEOC v. Shoney's, Inc.*, 536 F. Supp. 875, 877 (N.D. Ala. 1982). *See also Saridakis v. S. Broward Hosp. Dist.*, 681 F. Supp. 2d 1338, 1353 (S.D. Fla. 2009) ("[A]n employee's complaint cannot be so vague that an employer is unaware the complaint concerns illegal [conduct] . . . ."). Although DeVillo undisputedly complained to Cotton about her personal issues with Knatt, DeVillo does not explicitly state in her deposition testimony or the declaration she submitted in opposition to summary judgment that she told Cotton that Knatt's supervision of her team violated the FAR or any other law.[9] *See Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) (district court did not err in finding that the plaintiff failed to establish a *prima facie* case of retaliation when "almost all of [the plaintiff's] complaints had no relationship to race" and instead, "stemmed from a personality conflict [with a coworker]"). Even DeVillo's purported generalized complaints to Cotton about Knatt "being given authority to supervis[e]," doc. 23-1 at 16, or that she had "no other option but to file a

---

DeVillo and Knatt engaged in an altercation and Knatt "took off out the door and ran down to Cynthia Cotton's office," DeVillo told Cotton, "We cannot work like this. . . . I feel I have no other option but to file a complaint." *Id.* at 23.

[9] In contrast, DeVillo explicitly testified that she told Dennis Bacon, the onsite Department of Defense representative, that she believed Knatt's supervision of her team violated the FAR. *See* doc. 23-1 at 14. There is no evidence in the record that Bacon shared this complaint with Cotton or anyone else at Vision Centric.

complaint," *id.* at 23, are not sufficiently specific to alert Cotton that DeVillo was alleging that Knatt's supervisory duties violated the FAR, rather than basic complaints about a bad supervisor. *See Thaxton-Brooks v. Baker*, 647 F. App'x 996, 1000 (11th Cir. 2016) (vague comments "about ethical violations and questionable hiring practices . . . do not constitute protected activities because they do not relate to racial discrimination or retaliation"). In short, based on this record, even if DeVillo is correct that Cotton made the discharge decision — a contention the record does not support, her *prima facie* claim fails, because she cannot show that she placed Cotton on notice that she was protesting a violation of the FAR.

**B. DeVillo Cannot Rebut Vision Centric's Legitimate, Nonretaliatory Reason for her Discharge.**

Alternatively, DeVillo's claim fails because of Curry's legitimate, nonretaliatory reasons for discharging DeVillo, including his belief that DeVillo had behaved unprofessionally or confrontationally toward Vision Centric's customer (the Army Corps of Engineers) through her disputes with Knatt.[10] *See* doc. 22 at 20–22. Curry also was concerned about DeVillo's apparent class-based resistance to Knatt's authority, adding that Curry gave him the impression, through

---

[10] Vision Centric also contends that Curry harbored concerns of workplace violence in light of what he perceived as escalating conflict between DeVillo and Knatt. *See* doc. 22 at 20–22. However, because, as explained *infra*, DeVillo cannot rebut the other proffered reason, the court will not address this alternative contention. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir. 2007) (Where "the employer proffers more than one legitimate, non[retaliatory] reason, the plaintiff must rebut *each* of the reasons to survive a motion for summary judgment.") (emphasis added).

her statement that "Bridget [Knatt] is a GS-5 and she don't tell me what to do," that, as a GS-13, she was "better than" Knatt. Doc. 23-2 at 17, 19. *See also* doc. 23-1 at 18 (DeVillo's testimony that "a government GS5 is not a supervisory position," and "[i]t does not qualify to supervise anybody, you know, the janitor").

Because these are reasons that might motivate a reasonable employer, *see Kilgore v. Trussville Dev., L.L.C.*, 646 F. App'x 765, 774–75 (11th Cir. 2016) ("[B]eing rude or discourteous towards guests 'might motivate a reasonable employer' engaged primarily in customer service to discharge an employee, even if she does dispute whether she was in fact rude or discourteous toward guests."), to survive summary judgment, DeVillo must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Vision Centric's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence," *see Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997). DeVillo attempts to do so here by "den[ying] telling Curry" that "Knatt couldn't tell her what to do 'because she was a GS-5,'" doc. 27 at 30, and insisting that she was not "aggressive, hostile, insubordinate, or inappropriate to Knatt in any way," *id.* Unfortunately, these contentions are insufficient to prove that Curry did not reasonably believe that DeVillo had behaved inappropriately toward Knatt. Moreover, based on the record, Curry formed this belief based on what Cotton told

12

him — i.e., that DeVillo and Knatt had engaged "in an altercation," doc. 23-2 at 16, and from DeVillo's statements to Curry, including that Knatt "had no right to speak to [her] in that manner," doc. 23-1 at 24. Regardless of whether DeVillo's underlying points had merit, Curry believed that Knatt, "as a customer, [had] the right to say what is acceptable and isn't acceptable on a product that [she] asked for." Doc. 23-2 at 12. *See also id.* at 13 ("[I]f we have a problem with that customer, we work it – we don't get aggressive and become almost confrontational with the customer. That's not the protocol we take."). Based on this evidence, DeVillo cannot prove that Curry had no reasonable basis for concluding that DeVillo's continuing to work on the Fuel Depot Contract would prove detrimental to his relationship with his client.[11]

---

[11] To the extent DeVillo contends that the articulated reason for her discharge is pretextual based on "shifting reasons" for her separation, *see* doc. 27 at 8 (DeVillo noting that "Curry and Cotton . . . told the unemployment office that [DeVillo] was terminated because of a 'reduction in force due to reduction in work.'"), as an initial matter, there is no credible evidence that anyone at Vision Centric reported to the unemployment office that Vision Centric discharged DeVillo due to a reduction in force, except for DeVillo's hearsay that some person from the unemployment office informed her that Vision Centric had listed "reduction in force due to reduction in work" as the reason, *see* doc. 23-1 at 31. Moreover, although Curry testified that the unemployment paperwork he received from the unemployment office listed "reduction in force" as the reason, he added that he had no dealings with the unemployment office, and that he instructed Human Resources Director Octavia Garrett to "leave it like that," doc. 23-2 at 19, i.e. to not change the document sent to the company. Significantly, Garrett testified that the document, in fact, listed "misconduct" as the reason for the separation, that she did not change it, and more importantly, she read from the document during her deposition and it, in fact, listed "misconduct" as the reason for DeVillo's separation. *See* doc. 23-2 at 14. In other words, the documentary evidence does not support DeVillo's contention, if any, that Vision Centric gave a false reason for her discharge.

## IV. CONCLUSION

Ultimately, even if Curry or Cotton knew specifically about DeVillo's FAR complaints prior to DeVillo's separation, DeVillo has failed to present evidence that the alleged retaliatory intent was the but-for cause of her separation. *See Univ. of Tex. Southwestern Med. Ct. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."); *id.* at 2533 ("This requires proof that the unlawful retaliation *would not have occurred* in the absence of the alleged wrongful action or actions of the employer.") (emphasis added). DeVillo admits that one of the three options Curry offered was "administrative leave" until Curry could find another position for DeVillo (i.e., one where she would not have to work alongside Knatt), doc. 23-1 at 27, and Curry testified that he presented DeVillo with this option because he "really didn't want to lose [her]," doc. 23-2 at 13–14. The only reasonable inference, based on this record, is that Curry believed it was necessary to separate DeVillo and Knatt due to the undisputed personality conflict, and, because he had no control over Knatt,[12] he chose to address the situation by removing DeVillo from the Fuel Depot Contract. Even if Curry reached an erroneous conclusion, because federal courts "do not sit as a super-

---

[12] As Curry stated in his deposition, "The government is the government. I don't control the government. My employee is my responsibility, and how we carry ourselves and behave." Doc. 23-2 at 18.

14

personnel department that reexamines an entity's business decisions," and, "no matter how mistaken the firm's managers," the federal anti-retaliation statutes "do[] not interfere," *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("If the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."), no basis exists on this record to sustain DeVillo's claim. Therefore, because DeVillo cannot establish a *prima facie* case or, alternatively, because she cannot prove that each of Curry's proffered reasons for her separation were mere pretext designed to mask retaliation, the motion for summary judgment, doc. 22, is due to be granted. A separate order will be entered contemporaneously herewith.

**DONE** the 9th day of August, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE